# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| BILLJCO, LLC, § | | |
| § | | |
| *Plaintiff*, § | | |
| § | | |
| v. § | CIVIL ACTION NO. | 2:21-CV-00181-JRG |
| § | | (LEAD CASE) |
| CISCO SYSTEMS, INC., § | | |
| § | | |
| *Defendant*. § | | |

| | | |
|---|---|---|
| v. § | CIVIL ACTION NO. | 2:21-CV-00183-JRG |
| § | | (MEMBER CASE) |
| HEWLETT PACKARD ENTERPRISE § | | |
| COMPANY, ARUBA NETWORKS, LLC., § | | |
| § | | |
| *Defendants*. | | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

In these consolidated patent cases, Plaintiff BillJCo, LLC, alleges infringement of claims from three patents—U.S. Patents 8,761,804, 10,292,011, and 10,477,994—by Defendants Cisco Systems, Inc., Hewlett Packard Enterprise Co., and Aruba Networks, LLC. Each patent relates to "location based exchanges of data between distributed mobile data processing systems for locational applications." '804 Patent at 1:22–24; *see also* '011 Patent at 38–40; '994 Patent at 1:45–47.

The parties dispute the scope of five terms across the three patents. For each term, Plaintiff argues for a construction of "plain and ordinary meaning," whereas Defendants advance a specific construction. Having considered the parties' briefing, along with arguments of counsel during a February 17, 2022 hearing, the Court resolves the parties' disputes as follows.

I. BACKGROUND

A. U.S. Patent 8,761,804

The '804 Patent relates to "location based exchanges of data between distributed mobile data processing systems for locational applications." '804 Patent at 1:22–24. "Location based exchange" (or LBX) is a coined term, which the patent distinguishes from the more familiar "location based services" (or LBS):

> LBX describes leveraging the distributed nature of connectivity between [mobile data processing systems (MSs)] in lieu of leveraging a common centralized service nature of connectivity between MSs. The line can become blurred between LBS and LBX since the same or similar features and functionality are provided, and in some cases strengths from both may be used. The underlying architectural shift differentiates LBX from LBS for depending less on centralized services, and more on distributed interactions between MSs. LBX provide server-free and server-less location dependent features and functionality.

*Id.* at 3:65–4:8; *see also id.* at 3:57–59 ("This disclosure introduces a new terminology, system, and method referred to as Location Based eXchanges (LBX)."). "Mobile data processing systems" (or MSs) are simply mobile devices, such as laptops and smartphones. *See id.* at 3:7–17.

In the Background, the '804 Patent identifies several disadvantages of centralized web services—that is, web services that use an intermediary point between clients. For example, with centralized web services, "[r]egardless of the number of threads of processing spread out over hardware and processor platforms, the web service itself can become a bottleneck causing poor performance for timely response, and can cause a large amount of data that must be kept for all connected users and/or systems." *Id.* at 2:1–6. Similarly, centralized web services can give rise to security concerns, given that such a service inherently holds large amounts of user information in a centralized database. *Id.* at 2:43–58.

One way to address these disadvantages is by shifting more of the processing to the mobile devices. As the patent explains:

> Mobile data processing systems can intelligently handle many of their own application requirements without depending on some remote service. Just as two people in a business organization should not need a manager to speak to each other, no two mobile data processing systems should require a service middleman for useful location dependent features and functionality. The knowing of its own location should not be the end of social interaction implementation local to the mobile data processing systems, but rather the starting place for a large number of useful distributed local applications that do not require a service.

'804 Patent at 2:63–3:6.

Problematically, however, many mobile devices cannot be automatically located. *Id.* at 3:17–20. "Conventional methods use directly relative stationary references such as satellites, antennas, etc. to locate MSs. Stationary references are expensive to deploy, and risk obsolescence as new technologies are introduced to the marketplace. Stationary references have finite scope of support for locating MSs." *Id.* at 3:20–25.

To address that problem, the patent suggests "[a] method . . . for enabling users to get location dependent features and functionality through having their mobile locations known, regardless of whether or not their MS is equipped for being located." *Id.* at 3:44–49. The '804 Patent summarizes the disclosure as:

> a distributed system and method for enabling new and useful location dependent features and functionality to mobile data processing systems. Mobile data processing systems interact with each other as peers in communications and interoperability. A mobile data processing system may dynamically take on roles, depending on the environment and capabilities available at a particular time. Reference whereabouts data is appropriately shared between mobile data processing systems to carry out automatic location techniques ensuring mobile data processing systems are kept up to date with their own whereabouts and whereabouts of others, regardless of the freely moving travels of any of the mobile data pro-

cessing systems involved, and the location technologies that may or may not be available when needed. . . .

'804 Patent at [57].

The parties dispute the scope of three terms from the '804 Patent: (1) "application" (which is also at issue with respect to the '994 Patent and '011 Patent); (2) "an application in use at the sending data processing system"; and (3) "identity information for describing an originator identity."

The '804 Patent issued from Application No. 14/033,540. '804 Patent at [21]. The applicant filed the '540 Application as a continuation of Application No. 12/077,041. *Id.* at [63].

### B. U.S. Patents 10,292,011 and 10,477,994

The '011 Patent and '994 Patent are related and share the same disclosure. Like the '804 Patent, both patents claim priority to the '041 Application. '994 Patent at [63]. Moreover, both patents relate to "location based exchanges of data between distributed mobile data processing systems for locational applications." '011 Patent at 1:38–40; *see also* '994 Patent at 1:45–47. Not surprisingly, the Background sections are the same as that of the '804 Patent and describe the same problems. The specification, however, is considerably longer than the '804 Patent (which itself is lengthy).

The abstracts of the two patents are similar:

> Mobile data processing Systems (MSs) interact with systems in their vicinity, and with each other, in communications and interoperability. Information transmitted inbound to, transmitted outbound from, is in process at, or is application modified at a mobile data processing system triggers processing of actions in accordance with user configurations, for example to present content to a user. . . .

'011 Patent at [57]; *see also* '994 Patent at [57] (similar).

The parties dispute the scope of three terms from these two patents: "a Bluetooth

communications interface," which only appears in claims of the '994 Patent; "application," which appears in all three patents; and "application context identifier data," which only appears in the '011 Patent.

## II.    LEGAL STANDARDS

### A.    Generally

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention,

i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistica-

tion of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, the parties agree a skilled artisan would have had "at least a Bachelor's degree in electrical engineering, computer science, or a related field, and one or two years of work experience in wireless communications and mobile computing devices, or the equivalent." Dkt. No. 65 at 3; Dkt. No. 67 at 6 (agreeing that Plaintiff's definition of the level of ordinary skill is appropriate).

## IV.   THE DISPUTED TERMS

### A.   "a Bluetooth communications interface" ('994 Patent, Claims 1, 8, 14)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning.<br>("a means for transmitting information in the Bluetooth wave spectrum, i.e., 2.4 GHz." Dkt. No. 65 at 7.) | Bluetooth as defined in the Bluetooth Core Specification as of the priority data of the asserted patents |

Claim 1, which is representative of the other claims in which this term appears, recites:

1. A beaconing data processing system, comprising:

    one or more processors;

    *a Bluetooth communications interface*; and

    a memory coupled to the one or more processors, wherein the one or more processors access the memory and control operations of the beaconing data processing system, the operations comprising:

    periodically beaconing outbound a broadcast unidirectional wireless data record communicated through *the Bluetooth communications interface* to serve as a physical location reference contributing to physical location determination processing of one or more user carried mo-

> bile data processing systems in *a Bluetooth wave spectrum* range vicinity of the beaconing data processing system, the beaconing data processing system:
>
> . . .
>
> not configured to process inbound communications resulting from the receipt of the broadcast unidirectional wireless data record in the one or more user carried mobile data processing systems, the broadcast unidirectional wireless data record communicated through *the Bluetooth communications interface* to serve as the physical location reference . . . .

'994 Patent at 448:28–62.

The parties dispute whether "a Bluetooth communications interface" should be limited to Bluetooth standards existing on or before the priority date of the '994 Patent. Arguing the term *should* be limited in that way, Defendants cite several district court decisions that "found the plain and ordinary meaning is reflected in the issued standards that existed at the time of the invention." Dkt. No. 67 at 7–8 (citing cases). Plaintiff, however, contends Defendants' construction ignores the phrase "communications interface," and focuses only on "Bluetooth." Dkt. No. 65 at 5. Further, Plaintiff urges the applicant use "Bluetooth" to refer only to a wave spectrum in the 2.4 GHz range. *Id.* at 5–6; *see also id.* at 7 ("The plain and ordinary meaning for a 'Bluetooth communication interface'—a means for transmitting information in the Bluetooth wave spectrum, i.e., 2.4 GHz—should be adopted by this Court.").

The specification references "Bluetooth" three times. The first two occur in the same paragraph:

> Locating functionality may incorporate triangulated locating of the MS, for example using a class of Radio Frequency (RF) wave spectrum (cellular, WiFi (some WiFi embodiments referred to as WiMax), *bluetooth*, etc), and may use measurements from different wave spectrums for a single location determination

> (depends on communications interface(s) available). A MS may have its whereabouts determined using a plurality of wave spectrum classes available to it (cellular, WiFi, *bluetooth*, etc).

'994 Patent at 6:55–63 (emphasis added). The third reference relates to FIG. 24C:

> Presence of field 2490d indicates to send processing feeding from queue 24 to target the MS ID over the specified comm. interface (e.g. when MS has a plurality of comm. interfaces (e.g. cellular, WiFi, *Bluetooth*, etc; i.e. MS supports multiple classes of wave spectrum)).

*Id.* at 121:11–15 (emphasis added).

Plaintiff characterizes "Bluetooth" as "a brand name for a short-range wireless transmission technology that transmits in a radio frequency (RF) wave spectrum," Dkt. No. 65 at 5, but that characterization understates the implications of the term. The Bluetooth specification submitted by Defendants not only details frequency bands (or the "wave spectrum"), Specification of the Bluetooth System (July 26, 2007), Dkt. No. 67-4 at 12, but message sequences, discoverability modes, data packet formats, signal packet formats, security, and more, *see generally id.* at 9–21. The document is 900-plus pages of information. *See id.* at 21. That specification confirms a skilled artisan would not understand "Bluetooth" as only referring to transmitting and receiving in the 2.4 GHz frequency range.

Concerning the claims, Plaintiff notes Claim 1 recites some of the functionality of the claimed "Bluetooth communications interface" and expressly specifies a "Bluetooth wave spectrum." Dkt. No. 65 at 6. While true, that is not inconsistent with Defendants' position, as there is nothing surprising about a device that uses "a Bluetooth communications interface" operating in the frequency range required by the Bluetooth standard. Moreover, the applicant's use of both "Bluetooth communications interface" and "Bluetooth wave spectrum" in Claim 1 supports this conclusion. *See Innova*, 381 F.3d at 1119 ("[W]hen an applicant uses different terms in a claim it

is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

With respect to the specification, Plaintiff correctly notes each use of "Bluetooth" expressly references "a class of Radio Frequency (RF) wave spectrums." Dkt. No. 65 at 6. The first two references specifically refer to wave spectrums, but the surrounding language notes the wave spectrum "depends on [the] communications interface(s) available." '994 Patent at 6:55–63. Like the claim language, the last reference explains, unsurprisingly, that when an MS has a plurality of wireless communication interfaces, it supports the frequency ranges associated with those interfaces. *See id.* at 121:11–14. If anything, the specification supports the distinction urged by Defendants—that a wave spectrum can be one characteristic of a communications interface, but that "wave spectrum" and "communications interface" are not the same thing.

In short, the Court agrees with Defendants. In the claims, "a Bluetooth communications interface" means "a communications interface using Bluetooth standards that existed at the time of the claimed invention." This is consistent with how this Court and other courts have construed similar terms involving industry specifications. *See ACQIS LLC v. Samsung Elecs. Co.*, No. 2:20-cv-00295-JRG (E.D. Tex. Sept. 26, 2021)), Dkt. No. 67-2 at 32–33 (stating "the term 'Universal Serial Bus (USB) protocol' must be interpreted as of the priority date"); *Uniloc USA, Inc. v. Apple, Inc.*, No. 19-cv-1692, 2021 WL 432183, at *8 (N.D. Cal. Jan. 15, 2021) (holding "Bluetooth messaging" and "Bluetooth protocols" should be limited to functionality described in the Bluetooth specification "as it existed at the time of the claimed invention"); *Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co.*, No. 2:17-cv-145-JRG-RSP, 2018 WL 647734, at *11 (E.D. Tex. Jan. 31, 2018) (citation omitted) ("The term 'USB' in the patents-in-suit should be limited to the Universal Serial Bus standards that existed at the time of the claimed invention."); *see also*

*Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001) ("[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing." (citation omitted)). Further, the Court specifically rejects that the term refers only to hardware for operating in the 2.4 GHz frequency range.

B.     "application" ('011 Patent, Claims 1, 11, 20; '994 Patent, Claims 1–3, 8–10, 14–16; '804 Patent, Claims 1, 11)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning.<br><br>("a computer software program for performing a function." Dkt. No. 65 at 9.) | An entity of processing which can be started, terminated, and have processing results. Applications (i.e., executables) can be started as a contextual launch, custom launch through an API or command line, or other launch method of an executable for processing. |

The parties' dispute centers on whether this term requires an executable file and the extent of necessary user interaction. Plaintiff contends the plain and ordinary meaning of this term is simply "a computer software program for performing a function." Dkt. No. 65 at 9. Defendants contend the applicant defined "application" in both the '011 Patent and the '994 Patent, Dkt. No. 67 at 10–11, and that Plaintiff's expert supports Defendants' construction by explaining an "application" is "an executable that runs." Dkt. No. 67 at 11. According to Defendants, Plaintiff attempts to encompass "both executable and non-executable programs." *Id.* In its reply, Plaintiff criticizes Defendants' construction as using language from one group of embodiments related to "atomic commands." Dkt. No. 68 at 5–6.

Although this term appears in claims of all three patents, Defendants rely on a passage that only appears in the '011 Patent and '994 Patent:

> [T]he terminology 'application' and 'executable' are used interchangeably to represent an entity of processing which can be started, terminated, and have processing results. Applications (i.e. executables) can be started as a contextual launch, custom launch through an API or command line, or other launch method of an executable for processing.

'011 Patent at 269:53–59; *see also* '994 Patent at 269:66–270:5.

The Court disagrees this passage is definitional. For one, it appears in only two of the three patents, and then only with respect to FIGS. 63–74. *See* '011 Patent at 269:41–59 (including the passage on which Defendant relies as a description of the "#A figures" in FIGS. 63–74). Defendant does not contest this, but responds by claiming Plaintiff "fails to identify a single embodiment, in over 400 columns of the specification, that is somehow excluded" from Defendant's construction. Dkt. No. 67 at 12. But finding lexicography does not turn on whether a patent's use of a term is internally consistent with a party's proposed construction. Rather, the question is whether the applicant "'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)) ("It is not enough for a patentee to . . . use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term.").

The applicant did not do so here. Not only is the passage limited to certain figures of the disclosure, it focuses more on what applications and executables can *do* rather than what they *are*. Accordingly, the Court rejects Defendants' lexicography argument and will give this term its plain and ordinary meaning.[1]

---

[1] Defendants frame the issue as "[w]hether a software program [that] performs without a need for user execution . . . can be considered an 'application.'" H'rg Slides, Dkt. No. 85-1 at 37. Defend-

C.   "application context identifier data" ('011 Patent, Claims 1, 11, 20)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | "data identifying a context in which the application was presented to a user via a user interface" |

These claims recite processors that send "a broadcast unidirectional wireless data record." '011 Patent at 448:11–28. That record includes "*application context identifier data* identifying location based content for presenting by a location based application of the receiving [system]." *Id.* 448:14–38 (emphasis added). The location based content is presented to a user interface of the receiving system, *id.*, and may be, for example, news, traffic, real estate, a job opportunity, a religious interest, and the like. *Id.* at 449:24–32.

Effectively, the parties dispute whether "application context" requires the application to be (or have been) presented to a user via a user interface. Plaintiff contends the application need not be presented to the user and instead could run in the background. Dkt. No. 65 at 14 (citing Sharony Decl., Dkt. No. 65-18 ¶ 37). Defendants, however, urge "a given application context is based on the context in which the application was 'focused,' i.e., presented to the user via a user interface." Dkt. No. 67 at 13. In particular, Defendants reference text describing FIG. 76A:

> If block 7624 determines an image lies in the focused object, then processing continues to block 7626A. Block 7624 accesses appropriate status or data processing indication for knowing an image (frame) is in the *user interface context*. There are a variety of MS applications where an image is detected for being present in the focused user interface. These applications include:
>
>   MS camera mode after just taking a snapshot of an image (a frame);
>
>   MS browse of a snapshot image previously taken;
>
>   MS camcorder/video while in standby or record mode;

---

ants, however, did not address this issue directly, instead relying only on its "lexicography" argument.

>MS browse/review of a previously recorded video image stream (a plurality of frames);
>
>MS edit of a snapshot image;
>
>MS edit of an image stream; or
>
>Any other application context where some image is *currently presented to the MS user interface*.

*Id.* at 309:20–33 (emphasis added).

Defendants' construction is too narrow. For one, the specification distinguishes between an application context and a user-interface context. *See, e.g.*, '011 Patent at 318:57–62 ("In some embodiments, the *user interface context* is determined by access to a user interface object handle . . . In another embodiment, the user action itself . . . uniquely identifies the *application context* desired by the user (e.g. distinct keystroke(s)) *regardless of what user interface is currently in focus,* so that block 7662 accesses the command (user action) for specific information of the requested context." (emphasis added)). This distinction aligns with the claim language, which explains the location based content is "for presenting . . . to a user interface" of the *receiving* system." *Id.* at 448:34–35. Thus, if presenting requires a user interface, from which a user interface context can be derived, application context logically means something else.

The description of FIG. 76A further supports the distinction between "application context" and "user interface context," as each of the exemplary applications are described as *currently presented* to the user interface. For example, the listed applications suggest current user interaction: (1) "camera mode *after just taking a snapshot*"; (2) *the user browsing or reviewing* a previously recorded video image stream; or (3) *the current edit* of an image stream. Indeed, the specification suggests "[t]here are a variety of MS applications where an image is detected for being present in the focused user interface," including "[a]ny other application context where

some image is *currently presented to the MS user interface.*" If all application contexts were, without more, "where some image is currently presented to the MS user interface," this distinguishing language would be unnecessary.

Ultimately, the Court concludes "application context" does not inherently require presentation to the user *by the sending system*. This would necessarily require that an "application" must at some point present something to the user, but Defendants have not persuaded the Court that requirement is inherent the term's meaning. The Court therefore rejects that aspect of Defendant's construction and will give this term its plain and ordinary meaning.

### D. "an application in use at the sending data processing system ('804 Patent, Claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | "an application running on the sending data processing system" |

The claim recites the step of "accessing, by the sending data processing system, application information for *an application in use at the sending data processing system*." '804 Patent at 117:65–67 (emphasis added). The method then prepares "a broadcast unidirectional wireless data record" that includes the application information, and ultimately transmits that wireless data record "for receipt by a plurality of receiving mobile data processing systems." *Id.* at 118:13–14.

The parties dispute the meaning of "in use." Plaintiff contends a skilled artisan would recognize that "in use" does not necessarily mean an application is actively engaged by the user. Plaintiff suggests "in use" includes an application running in the background, or in a low-power or sleep mode. Dkt. No. 65 at 16. Defendants characterize Plaintiff's position as contemplating "the mere fact that an application is loaded onto a device means that it is 'in use,' because the application may have run in the past or may run in the future." Dkt. No. 67 at 17. Defendants

contend "in use" means the application is presently "running."

The Court agrees with Plaintiff that "in use" does not require active engagement by the user and that an application operating in low-power mode can be, but isn't necessarily, "in use." With respect to a "sleep" mode, Defendants have not sufficiently shown the specific technical meaning and impact of "sleep" mode as understood by a skilled artisan, and have failed to show that an application cannot be "in use" even in sleep mode, depending on what the characteristics of that mode are. The Court, however, agrees with Defendants that "the mere fact that an application is loaded onto a device" does not mean that it is "in use" as required by the claims.

Here, Defendants' construction simply substitutes "running" for "in use" without explaining how a skilled artisan would understand the term's scope. Rather than painting all "applications" with a broad brush, the answers to these questions depend on the specific implementation of a particular application (e.g., how it is coded and its intended use), which neither party presented to the Court for resolution. The Court will therefore give this term its plain and ordinary meaning.

### E. "identity information for describing an originator identity" ('804 Patent, Claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | "an identifier that uniquely identifies the originator device" |

Claim 1 of the '804 Patent recites "accessing, by the sending data processing system, identity information for describing an originator identity associated with the sending data processing system." '804 Patent at 117:62–64. The method then prepares "a broadcast unidirectional wireless data record" that includes the identity information, and ultimately transmits that wireless data record "for receipt by a plurality of receiving mobile data processing systems" in the vicini-

ty. *Id.* at 118:10–12. "[T]he identity information is for an alert determined by each receiving mobile data processing system [that it] is in the wireless vicinity of the sending data processing system[.]" *Id.* at 118:33–40.

The parties dispute whether this disputed claim language[2] requires the "originator device" to be "uniquely" identified. Arguing for such a requirement, Defendants contend the MSs need to identify whereabouts data records (WDRs) uniquely because they contain records for their location as well as other mobile data processing systems. Dkt. No. 67 at 18–19. Plaintiff, however, argues nothing in the claim language requires the originating identity of the whereabouts data to be unique. Dkt. No. 65 at 17. Further, says Plaintiff, a skilled artisan would understand there is no reason to require an identifier to uniquely identify the originator device. *Id.* Thus, "the MSs may have a unique identifier, a nonunique identifier, a group identifier or no identifier at all." Dkt. No. 68 at 10.

The Court agrees with Plaintiff that the "identity information" need not uniquely identify an originator identity. For one, Defendants' position equates "describing" with "uniquely identifying," but that goes too far based on the plain and ordinary meaning of those terms. Second, although the specification refers to uniquely identifying MS handles, *see, e.g.*, Dkt. No. 67 at 19, 21 (citing the specification), Defendants have not persuaded the Court those handles are the "originator identity" recited in the claims. Accordingly, the Court rejects Defendants' requirement that the "identity information" must uniquely identify the "originator identity" and will give this term its plain and ordinary meaning.

---

[2] This phrase does not appear in the specification, nor does "identity information" or "originator identity."

## V.   CONCLUSION

| Term | The Court's Construction |
|---|---|
| "a Bluetooth communications interface" ('994 Patent, Claims 1, 8, and 14) | "a communications interface using Bluetooth standards that existed at the time of the claimed invention" |
| "application" ('011 Patent, Claims 1, 11, 20; '994 Patent, Claims 1–3, 8–10, and 14–16; '804 Patent, Claims 1, 11) | Plain and ordinary meaning. |
| "application context identifier data" ('011 Patent, Claims 1, 11, 20) | Plain and ordinary meaning. |
| "an application in use at the sending data processing system" ('804 Patent, Claims 1) | Plain and ordinary meaning. |
| "identity information for describing an originator identity" ('804 Patent, Claim 1) | Plain and ordinary meaning. |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Moreover, no party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**So ORDERED and SIGNED this 14th day of March, 2022.**

*/s/ Rodney Gilstrap*
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE